David C. Parisi (SB #162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SB #188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

*Attorneys for Plaintiff*
[Additional counsel appear on signature page]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NICHOLAS DERBY, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>AOL, INC., a Delaware corporation,<br><br>Defendant. | Case No. 15-cv-00452<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AOL, INC.'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Hearing Date: September 11, 2015<br>Hearing Time: 9:00 AM<br>Courtroom 6, 4th Floor<br><br>Hon. Ronald M. Whyte |

**TABLE OF CONTENTS**

**I. INTRODUCTION** .......... 1

**II. LEGAL STANDARD** .......... 3

**III. ARGUMENT** .......... 4

**A. As Emphasized In The 2015 FCC Ruling, A System That Has The Potential Capacity To Dial Numbers Without Human Intervention Is An ATDS** .......... 4

**B. The Initial Three Text Messages Were Sent By An ATDS Because Defendant's AIM System Has The Potential Capacity To Dial Numbers Without Human Intervention** .......... 6

**C. The Authorities Relied On By This Court In Its MTD Order Have Been Rendered Inapposite By The 2015 FCC Ruling** .......... 10

**D. The 2015 FCC Ruling Establishes That Internet-To-Phone Text Message Services Such As Defendant's AIM System Are *Per Se* Autodialers** .......... 12

**E. Defendant "Made" The Calls At Issue** .......... 13

**F. In Light Of The 2015 FCC Ruling, This Court Should Revisit Its Prior MTD Order Finding The Confirmation Text Not Actionable** .......... 15

**IV. CONCLUSION** .......... 17

# TABLE OF AUTHORITIES

**Page(s)**

**United States Supreme Court Cases:**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 3, 4

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 4

**United States Circuit Court of Appeals Cases:**

*CE Design, Ltd. v. Prism Business Media, Inc.*,
606 F.3d 443 (7th Cir. 2010) ........ 6

*Gibson v. U.S.*,
781 F.2d 1334 (9th Cir. 1986) ........ 3

*Johnson v. Riverside Healthcare Sys., LP.*,
534 F.3d 1116 (9th Cir. 2008) ........ 3

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008) ........ 3, 6

*Moss v. U.S. Secret Serv.*,
572 F.3d 962 (9th Cir. 2009) ........ 4

*Pac. Bell v. Pac–West Telecomm, Inc.*,
325 F.3d 1114 (9th Cir. 2003) ........ 6

**United States District Court Cases:**

*Gragg v. Orange Cab Co., Inc.*,
995 F.Supp.2d 1189 (W.D. Wash. 2014) ........ 10

*Johnson v. Yahoo!, Inc.*,
No. 14-cv-2028, 2014 WL 7005102 (N.D. Ill. 2014) ........ 6, 11

*Kristensen v. Credit Payment Servs. Inc.*,
No. 12-cv-00528, 2015 WL 4477425 (D. Nev. July 20, 2015) ........ 14

*Marks v. Crunch*,
No. 14-cv-00348, 2014 WL 5422976 (S.D. Cal. 2014) ........ 11

*Reardon v. Uber Technologies, Inc.*,
No. 14-cv-05678, 2015 WL 4451209 (N.D. Cal. July 19, 2015) ........ 6

*Roylance v. ALG Real Estate Servs., Inc.*,
No. 14-CV-02445, 2015 WL 1522244 (N.D. Cal. Mar. 16, 2015)........ 14

*Sherman v. Yahoo! Inc.*,
997 F.Supp.2d 1129 (S.D. Cal. 2014)........ 11, 12

*Thomas v. Taco Bell Corp.*,
879 F.Supp.2d 1079 (C.D. Cal. 2012) ........ 14

**Statutes and Court Rules:**

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ........*passim*

47 C.F.R. § 20.18(n)(1)........ 12

The Hobbs Act, 28 U.S.C. § 2342, *et seq.* ........ 6

Fed. R. Civ. P. 8 ........ 3

**Miscellaneous:**

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, FCC Report and Order, CG Docket No. 02-278* (July 3, 2003) ........ 4, 5, 9, 12

*In re DISH Network, LLC Petition for Declaratory Ruling, Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, FCC Declaratory Ruling, CG Docket No. 11-55* (May. 9, 2013)........ 13, 15

*In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
FCC 15-72 (July 10, 2015) ........ 1, 2, 3, 4, 5, 9, 12, 13, 15, 16

## I. <u>INTRODUCTION</u>

After Defendant AOL Inc.'s instant messaging system ("AIM system") sent Plaintiff four unauthorized text messages to his cellular telephone, Plaintiff filed his original Complaint on February 2, 2015, alleging that Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. (the "TCPA"). (Dkt. 1.) On June 1, 2015, this Court issued its ruling on Defendant's Motion to Dismiss ("MTD Order") finding that the first three text messages received by Plaintiff were not dialed by an Automatic Telephone Dialing System ("ATDS"), as required under the TCPA, because they were sent as a result of "human intervention." (MTD Order, Dkt. 28, at 6–8.) Although Plaintiff also received a fourth unauthorized "confirmation" message, the Court found that such confirmation messages are not actionable, and did not address Plaintiff's argument that such confirmation messages are evidence of the AIM system's *capacity* to dial numbers without human intervention. (MTD Order at 11–12; Pl's Opp. to Def's MTD, Dkt. 22, at 8–11.)

Plaintiff's Amended Complaint (Dkt. 31) directly addresses this Court's MTD Order dismissing Plaintiff's original Complaint and cures any deficiencies in the pleadings by establishing multiple examples of how Defendant's AIM system has the *capacity* to send various automated system messages without any human intervention. (Amend. Compl. at ¶¶ 28–36.) These additional allegations speak directly to the issue of whether Defendant's AIM system has the capacity to send text messages without human intervention that this Court did not reach in its prior ruling. More importantly, the new allegations implicate the recently released ruling by the FCC that clarifies that any determination of whether a system is an ATDS should *not* be based only on the system's *present* capacity, but rather on its *potential* capacity to function as an ATDS even if the system requires some modifications or "the addition of software" to actually do so.[1]

Defendant attempts to dismiss the additional allegations by claiming that they are

---

[1] *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, FCC 15-72, at ¶¶ 14–22 (July 10, 2015) ("2015 FCC Ruling"). Relevant excerpts from the 2015 FCC Ruling are attached hereto as <u>Exhibit A</u>.

"invented," "hypothetical," and "futile." (Def. MTD, Dkt. 35, at 2.) However, the additional automated text messages alleged in Plaintiff's complaint are actual, concrete, direct evidence that the same AIM system that sent the text messages to Plaintiff not only has the *potential* capacity to send text messages without human intervention (which is itself sufficient pursuant to the 2015 FCC Ruling), but actually has the *present* capacity to send text messages without human intervention. Given that at the pleading stage all factual allegations should be taken as true, Defendant's argument is based neither in law nor in fact. Furthermore, while Defendant attempts to draw this Court's attention away from these allegations by claiming that Plaintiff cannot possibly represent individuals that received such messages and that he "lacks standing to raise" such scenarios, the fact is that the allegations concerning such messages are being raised solely as evidence that the text messages Plaintiff *did* receive – and that he *does* have standing to raise – were sent by a system that has the capacity to send such messages without human intervention. Nor does Defendant dispute this Court's prior finding that the fourth confirmation text message was "sent automatically" and thus also evidences that the functional capacity of Defendant's AIM system renders it an ATDS. (MTD Order at 8.)

In addition, even if this Court finds that such evidence fails to show that Defendant's AIM system was an ATDS, the 2015 FCC Ruling establishes that "interconnected text provider[s]" that operate systems that allow for "internet-to-phone text messages," such as those at issue here, "require consumer consent." (Ex. A at ¶ 108; *Id.* at p. 57 n.370.) In so ruling, the FCC has at least implicitly determined that internet-to-phone text messages – such as those sent by Defendant – are *per se* sent using an ATDS.

Finally, to the extent Defendant argues that it did not "make" the call, the Amended Complaint clearly alleges that Defendant's AIM system "automatically dialed Plaintiff's cellular telephone number" (Amend. Compl. at ¶ 19), that it "sent the text message to Plaintiff's cellular telephone" (*Id.* at ¶ 22), and that the text message was sent using "shortcodes operated by Defendant and its agents[.]" (*Id.* at ¶ 35.) Furthermore, Defendant

ignores a long line of cases that establish that the entity that *dials* the telephone number and *sends* the message can be held directly liable under the TCPA. Nor is Defendant's attempt to use the 2015 FCC Ruling as the basis for its argument that it did not "make" the calls particularly convincing given that the ruling also reiterated that the TCPA requires "some direct connection between a person or entity and the making of a call." (Ex. A at ¶ 29) (internal citations omitted). Based on the facts alleged within the Amended Complaint, it was only Defendant's AIM system that had, and could have had, a "direct connection" to Plaintiff's cell phone.

As will be explained in detail below, the FCC's recent guidance that a system need only have the potential capacity to dial numbers without human intervention, combined with the added allegations within the Amended Complaint establishing such potential capacity, weigh heavily in favor of denying Defendant's Motion to Dismiss.

## II. LEGAL STANDARD

Under Rule 8(a)(2), a complaint requires only a "short and plain" statement of the claim showing that the plaintiff is entitled to relief and notifying the defendant of the principal events and the claims it is called upon to meet. *Johnson v. Riverside Healthcare Sys., LP.*, 534 F.3d 1116, 1122 (9th Cir. 2008); *Gibson v. U.S.*, 781 F.2d 1334, 1340 (9th Cir. 1986) (finding that a plaintiff is not expected "to plead his evidence"). When reviewing a Rule 12(b)(6) motion to dismiss, the court must construe all allegations and any reasonable inferences in the light most favorable to the plaintiff. *Johnson*, 534 F.3d at 1122. Furthermore, all factual allegations made in the complaint should be accepted as true. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where the complaint contains "well-pleaded factual allegations, a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679. Distilling the holdings in *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Ninth Circuit has held that a complaint will survive a motion to dismiss if the "factual content" and "reasonable inferences from that content," are "plausibly *suggestive* of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal citations omitted) (emphasis added).

## III. ARGUMENT

### A. As Emphasized In The 2015 FCC Ruling, A System That Has The Potential Capacity To Dial Numbers Without Human Intervention Is An ATDS.

As Defendant itself admits in its Motion to Dismiss, and as held by this Court in its prior MTD Order, a system that has "*capacity* to dial numbers without human intervention" is an ATDS. (MTD Order at 4 (citing *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14091–93 (July 3, 2003) ("2003 FCC Order")); Def. MTD at 4–5 (citing Ex. A at ¶ 17) (emphasis added)). However, what the Court's prior MTD Order was silent on, and which Defendant fails to address in its new Motion to Dismiss, is the importance of the term "capacity" and what relation it has to determining whether any given system is an ATDS under the TCPA.

The 2015 FCC Ruling directly addresses this issue and clarifies that "the capacity of an autodialer is not limited to its current configuration, but also includes its potential functionalities." (Ex. A at ¶ 16.) The Ruling goes on explain that "a piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of an 'autodialer' even if, for example, it requires the addition of software to actually perform [such] functions[.]" (*Id.* at ¶ 18) (citing 2003 FCC Order, 18 FCC Rcd at 14091–93, ¶¶ 131–133). As further stated by the FCC, such an "interpretation of 'capacity' to include 'potential ability' is consistent with formal definitions of 'capacity.'" (*Id.* at ¶ 19.) In addition, and more importantly, limiting "capacity" to mean "current capacity" or "present ability" would allow entities who engage in unauthorized autodialing to easily escape liability from the TCPA by creating systems with

multiple functions and thus making it nearly impossible to prove which functions were actually "presently" used for any given call. (Ex. A at ¶ 19.)

The 2015 FCC Ruling also makes it clear that the definition of "capacity" as also encompassing "potential ability" applies to the FCC's definition of an ATDS as equipment that has "the *capacity* to dial numbers without human intervention." 2003 FCC Order, 18 FCC Rcd at 14092, ¶ 132 (emphasis in original). Citing to the 2003 FCC Order, the 2015 FCC Ruling reiterated that the basic function of an ATDS is "the *capacity* to dial numbers without human intervention." (Ex. A at 17 n.78) (citing 2003 FCC Order, 18 FCC Rcd. at 14092, ¶ 132) (emphasis in original). At the same time, the 2015 FCC Ruling rejected a petition that sought to define an ATDS as "equipment that, *at the time of use*, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered." (*Id.* at ¶ 11) (emphasis added). The FCC found that such a "human intervention test" "amounts to a simple variation on the present ability arguments" that it had already rejected. (*Id.* at ¶ 20.) Thus any determination whether a system is an ATDS based on its ability to dial numbers without human intervention must also consider the system's *potential* capacity to do so.

Enforcing a "broad definition" of what constitutes an autodialer by looking at the present and future potential capacity of any given system is directly in line with Congressional intent in enacting the TCPA. Congress purposefully chose to use the word "capacity" which "includes a sense of futurity or unrealized potentiality." (*Id.* at 15 n.70.) Crucially, a "present use" or "present capacity test" would make the TCPA "largely meaningless" because "little or no modern dialing equipment would fit [such a narrow] statutory definition of an autodialer." (*Id.* at ¶ 20.) Additionally, the FCC's interpretation is not overbroad nor does it prohibit companies such as Defendant from owning or operating an autodialer. As the FCC 2015 Ruling explains, "the TCPA does not prohibit a business from communicating with its customers through robocalling, but rather merely requires businesses to obtain prior express consent from the consumer to receive such calls." (*Id.* at ¶ 62.)

As this Court stated in its prior MTD Order, "[w]hen Congress enacted the TCPA, it directed the [FCC] to promulgate regulations implementing the Act's requirements." (MTD Order at 4) (citing 47 U.S.C. § 227(b)(2)). Pursuant to the same "mandate" under which this Court found it was bound to the FCC's interpretation of ATDS to "include systems which have the capacity to 'dial stored numbers *without human intervention*,'" (MTD Order at 4) (emphasis in original), this Court is similarly bound by the FCC's clarification of the term "capacity" as it is used within the TCPA. *See Reardon v. Uber Technologies, Inc.*, No. 14-cv-05678, 2015 WL 4451209, at *6 (N.D. Cal. July 19, 2015) (holding that "[t]his court is bound by the FCC's interpretations of the TCPA, unless those interpretations are invalidated by a court of appeals") (citing 28 U.S.C. § 2342, *et seq.* (the "Hobbs Act"); *Pac. Bell v. Pac–West Telecomm, Inc.,* 325 F.3d 1114, 1125 (9th Cir. 2003)); *see also Johnson v. Yahoo!, Inc.*, No. 14-cv-2028, 2014 WL 7005102, at *3 (N.D. Ill. Dec. 11, 2014) (holding that the TCPA and the Hobbs Act bound the court to the FCC's interpretation of ATDS) (citing *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010)). As such, pursuant to the 2015 FCC Ruling, whether Defendant's AIM system is an ATDS should be determined according to whether it had the *potential* capacity to dial numbers without human intervention—a determination that militates in favor of denying Defendant's Motion to Dismiss.

### B. The Initial Three Text Messages Were Sent By An ATDS Because Defendant's AIM System Has The Potential Capacity To Dial Numbers Without Human Intervention.

Plaintiff's Amended Complaint provides concrete evidence that Defendant's AIM system has the potential (if not present) capacity to send text messages without human intervention. Plaintiff's Amended Complaint describes three different text messages that Defendant's AIM system automatically generates and sends in response to different situations. While Defendant attempts to paint these allegations as "invent[ed]" and "hypothetical" (Def. MTD at 2), these factual allegations are highly relevant and should be taken as true at the pleadings stage. *Behrens*, 546 F.3d at 588.

The first text message described is automatically sent to any individual who attempts to communicate with another user of Defendant's AIM system after the other user already signed off. (Amend. Compl. at ¶ 30.) If the user of the AIM system attempts to send another message to the unavailable user, he will automatically receive the following text message in response:

**AIM**
**<[Name of AOL user]> is not avail.**
**1 login <sn> <pass>**
**2 status <msg>**
**3send <sn> <msg>**
**h help**

(*Id.* at ¶ 30.) The system message identified above is sent without any human intervention because neither the user that receives it, nor the unavailable user, initiates the message, requests the message, drafts the message, or in any way decides whether the above text message would be sent, when it would be sent, or how many text messages to the unavailable user must be sent before this automated response is triggered. (*Id.* at ¶ 31.) Thus, while Defendant attempts to argue that the above message is sent as a result of "*three* separate instances of human intervention" (Def. MTD at 8), it is actually Defendant's AIM system that automatically drafts the message, sends it without any human intervention through a shortcode operated by Defendant, and actually *decides* when and whether to send the message based on an automated program operating entirely external and independent of any human action or decision.

The second and third text messages identified in Plaintiff's Amended Complaint are automatic status updates sent to users of Defendant's AIM system:

**AIM: <Name of AOL user> signed off of AIM.**

and,

**AIM: Your status has been changed to Online.**

(Amend. Compl. at ¶ 34.) Tellingly, Defendant briefly dismisses these two messages with little argument as to why they somehow fail to show the AIM system's capacity to dial numbers without human intervention. As with the other message previously identified

above, these two text messages are automatically generated by Defendant's AIM system, are sent as a result of a completely automatic process that determines when a user has signed in or out and whether a notification message should be sent, and are not requested by the party whose status on Defendant's AIM system actually changes. (Amend. Compl. at ¶ 35.) More importantly, unlike the first message identified above, these two messages are automatically sent by Defendant's AIM system *even if there is no outgoing text message* being sent by the user who receives them. (*Id.* at ¶ 33.) Thus, even if the user who receives one of the above messages is not in any way communicating through Defendant's AIM system, he will automatically receive these system text message updates.

Finally, the confirmation text message that Defendant's AIM system sent and that Plaintiff actually *did* receive, is also evidence that Defendant's AIM system has the capacity to send text messages without human intervention. As this Court stated in its prior MTD Order, "[u]nlike the first three, the confirmation text was *not* composed by an AIM user, and was sent *automatically* by AOL[.]" (MTD Order at 8) (emphasis added). If the confirmation text message that was sent in "response to plaintiff's text requesting that future message be blocked" was sent "automatically" (*Id.*), then surely the two automated status update system messages identified above were sent automatically by Defendant's AIM system without human intervention.

Defendant attempts to draw this Court's attention away from the capacity of its AIM system to send text messages without human intervention by arguing that Plaintiff "lacks standing to pursue claims" based on these text messages. (Def. MTD at 9.) Defendant, however, fundamentally misconstrues the purpose of these allegations. To be clear, Plaintiff is not claiming that he is seeking to represent individuals who received such text messages, or that he has standing to raise these text messages as independent violations of the TCPA that he has suffered. Rather, Plaintiff includes these allegations to show that the text messages that he *did* receive were sent by a system that had the *potential* capacity to send text messages without human intervention. As Plaintiff alleges, the identified text messages

were "sent . . . through the same AIM system" that sent the initial three text messages. (Amend. Compl. at ¶¶ 32, 36.) For the same reason, even if this Court finds that the confirmation text message is "inactionable," the fact that this Court has found that it was sent "automatically," is evidence that Defendant's AIM system has the requisite capacity to function as an ATDS under the TCPA.

Because a determination of whether a system is an ATDS is based on its potential capacity to dial telephone numbers without human intervention, "any call" (47 U.S.C. § 227(b)(1)(A)) made by such a system, even if the caller is not "actually . . .using those functionalities to place calls," is considered to be made by an ATDS and triggers TCPA liability. (Ex. A at 15 n.70.) As the FCC succinctly stated, "when a caller places a call using equipment that has the requisite 'capacity' . . . the equipment is an autodialer and a caller using it 'makes' a call 'using an [ATDS]' under section 227(b)(1)(A)." (*Id.*) This is consistent with the statutory language of the TCPA that focuses on assigning liability to "*any* call" made with "*any* automatic telephone dialing system." 47 U.S.C. 227(b)(1)(A) (emphasis added). As mentioned above, because requiring proof that calls were actually made using the autodialer feature would be very difficult, the TCPA focuses on the *equipment* used to make the calls, rather than the nature of the calls themselves. (Ex. A at ¶ 19; 2003 FCC Order, 18 FCC Rcd at 14092–96, ¶ 133 (noting that "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the restriction on autodialed calls not be circumvented."))

Therefore, even if Plaintiff does not have standing to pursue legal claims based on the automated system messages alleged in the Amended Complaint, and even if the confirmation text message is found to be inactionable, they are nonetheless each factual allegations to be taken as true that establish that the initial three text messages received by Plaintiff were sent by a system that has the potential capacity (if not the present capacity) to send text messages without human intervention, regardless of the equipment's utilization of such capacity to

send the specific messages at issue. In short, Plaintiff alleges sufficient facts to find that Defendant violated the TCPA when it sent the initial three unauthorized messages.

### C. The Authorities Relied On By This Court In Its MTD Order Have Been Rendered Inapposite By The 2015 FCC Ruling.

The cases that this Court cited to in support of its MTD Order dismissing Plaintiff's original Complaint have been rendered inapposite by the 2015 FCC Ruling because they focused on whether the system had the present capacity to function as an ATDS, rather than its potential capacity. In *Gragg v. Orange Cab Co., Inc.*, 995 F.Supp.2d 1189 (W.D. Wash. Feb. 28, 2014), the district court explicitly stated that "[a]dopting plaintiff's broad interpretation that any technology with the **potential** capacity to store or produce and call telephone numbers using a random number generator constitutes an ATDS[,]" "would lead to an absurd result." 995 F.Supp.2d at 1193–92 (emphasis in original). However, as the 2015 FCC Ruling makes clear, such an interpretation is not only reasonable – because a focus on present capacity would allow defendants to easily escape liability – it is also the proper legal standard set forth by the FCC for determining whether a system is an ATDS.

Furthermore, to the extent that the *Gragg* court ruled specifically on whether the system at issue in that case had the "capacity to dial lists of numbers without human intervention," the court similarly focused solely on its *present* ability to do so and only on how the exact text messages at issue were sent. *Id.* at 1193–94. The court noted that the system "does not function in the manner prohibited by the FCC" and that the "level of human agency involved in transmitting the text dispatch notifications is sufficient to qualify as 'human intervention.'" *Id.* at 1194. Thus, the court in *Gragg* looked solely to the system's present capacity to function as an ATDS. Additionally, and unlike the situation here, the Court in *Gragg* was not presented (or failed to mention) evidence that the system was capable of sending *other* messages without human intervention, as Plaintiff's Amended Complaint does here.

Similarly, to the extent that this Court previously found that "the facts of [*Johnson v. Yahoo*] . . . support dismissal of [Plaintiff's] claim" (MTD Order at 7), the court in *Johnson* also failed to take into account the system's potential capacity when it ruled that only the automated system message was actionable but not the "personalized message." 2014 WL 7005102, at *5. In *Johnson*, the court ruled that system messages sent by Yahoo's system were sent without human intervention. *Id.* However, as to the "personalized message" sent to the recipient, the court found that "it is clear that that transmission involves human intervention." *Id.* By focusing on how the system *presently* operated when it sent the "personalized message," and not on the system's potential capacity to send automated message (as evidenced by the automated system message), the ruling in *Johnson* is inconsistent with the 2015 FCC Ruling and the language of the TCPA which focuses on the equipment used to make the call, rather than how the equipment is used to make any particular call. *See* Part III.B, at 8–9 above.

Finally, as previously pointed out in Plaintiff's Opposition to Defendant's Motion to Dismiss (Dkt. 74), *Marks v. Crunch San Diego, LLC*, No. 14-cv-00348, 2014 WL 5422976 (S.D. Cal. Oct. 23, 2014), involved a system that utilized an "Anti-Spam policy" and prohibited numbers from being inputted without written consent or a "call to action" such that the system could not possibly have the potential capacity to functions as an ATDS. 2014 WL 6632810, at *3; Pl's Opp. to Def's MTD, at 18 n.7. Even without any discovery, it is apparent that these are features that Defendant's AIM system clearly lacks.

Standing in stark contrast to these cases is the ruling in *Sherman v. Yahoo! Inc.*, 997 F.Supp.2d 1129 (S.D. Cal. 2014), where the court denied the defendant's motion for summary judgment because discovery had shown that "there is a genuine issue of material fact as to whether the equipment [utilized] . . . constitutes an ATDS[.]" 997 F.Supp.2d at 1136. The court in *Sherman* focused in particular on deposition testimony of one of Defendant's engineers that "it could, if it wanted to, dial all of the telephone numbers in its database with a notification text message by writing new software code instructing the

system to do so" and that this fact "demonstrate[ed]" the system's capacity to function as an ATDS. *Sherman*, 997 F.Supp.2d at 1136. As stated in the 2015 FCC Ruling, whether a system is an ATDS depends on its potential capacity to function as an ATDS, even if "it requires the addition of software to actually perform [such] functions[.]" (Ex. A at ¶ 18) (citing 2003 FCC Order, 18 FCC Rcd at 14091–93, ¶¶ 131–133). The FCC noted that such an interpretation is necessary "to ensure that the restriction on autodialed calls not be circumvented" (*Id.* at ¶ 19) because "modern dialing equipment can often be modified remotely" (*Id.* at ¶ 16) and "the functional capacity of software-controlled equipment is designed to be flexible, both in terms of features that can be activated or de-activated and in terms of features that can be added to the equipment's overall functionality through software changes or updates." (*Id.* at 14 n.63.) Accordingly, the 2015 FCC Ruling re-affirms the ruling in *Sherman* that a determination of whether a system is an ATDS needs to be based on its potential capacity, including any potential software modifications.

Because Plaintiff alleges more than sufficient evidence to show that Defendant's AIM system has, at a minimum, the potential capacity to send text messages without human intervention, and because any evidence of how Defendant's AIM system can be modified to operate as an ATDS is solely within the possession of Defendant, Plaintiff should be allowed to proceed with discovery and determine the technical details of how Defendant's AIM system functions, and has the potential to function. Such a result is particularly proper given that the cases previously cited to in support of dismissing Plaintiff's Complaint have now been effectively overruled by the 2015 FCC Ruling.

### D. The 2015 FCC Ruling Establishes That Internet-To-Phone Text Message Services Such As Defendant's AIM System Are *Per-Se* Autodialers.

Even if this Court were to find that neither the automated text messages nor the confirmation message alleged within Plaintiff's Amended Complaint can support a finding that the AIM system is an ATDS, the fact that the AIM system is an "internet-to-phone" text message service on its own establishes that it was an ATDS. The 2015 FCC Ruling states

that "[i]nternet-to-phone text messages, including those sent using an interconnected text provider, require consumer consent." (Ex. A at ¶ 108.) The 2015 FCC Ruling clarifies that "[i]nterconnected text messaging services are services that enable consumers to send text messages to and receive text messages from all or substantially all text-capable U.S. telephone numbers, including through the use of applications downloaded or otherwise installed on mobile phones." (*Id.* at 57 n.370) (citing 47 C.F.R. § 20.18(n)(1)).

Defendant's AIM system clearly falls within the definition of an "interconnected text messaging service." As Plaintiff's Amended Complaint alleges, Defendant's AIM system is a "mass communication service that . . . converts thousands of 'instant messages' into SMS text messages that are transmitted wirelessly via abbreviated phone numbers known as 'short code' to cellular phones throughout the country." (Amend. Compl. at ¶ 14.) Furthermore, by ruling that text messages "sent using an interconnected text provider" require consumer consent, the FCC has determined that such messages are *per se* sent using an ATDS since the TCPA only requires consent for "any call" made "using an automatic telephone dialing system." 47 U.S.C. § 227(b)(1)(A). Therefore, because the initial three text messages were sent by Defendant's AIM system that operates as an "interconnected text messaging service," they were sent using an ATDS and thus required prior express consent from Plaintiff.

**E. Defendant "Made" The Calls At Issue.**

Defendant briefly makes the argument that the 2015 FCC Ruling "makes clear that, in this alleged circumstance, the 'calls' were made by the AIM user, not the AIM service." (Def. MTD at 6.) Defendant, however, simply quotes a single sentence in the 2015 FCC Ruling that itself cites to a 2013 FCC Declaratory Ruling regarding how "a person or entity initiates a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities . . . that might merely have some role . . . in the casual chain that results in the making of a telephone call." (Ex. A at ¶ 27) (citing DISH Network Declaratory Ruling, 28 F.C.C. Rcd. 6574, 6583, ¶ 26 (2013)).

Defendant's argument – which despite being based on language from the 2013 FCC Declaratory Ruling, it makes for the first time – is contrary to well-established case law that the entity that is the actual "sender of the text" can be held directly liable under the TCPA. *Thomas v. Taco Bell Corp.*, 879 F.Supp.2d 1079, 1084 (C.D. Cal. 2012) *aff'd*, 582 F.App'x 678 (9th Cir. 2014) (finding that direct liability can only be imposed on the "actual sender of the text"); *Kristensen v. Credit Payment Servs. Inc.*, No. 12-cv-00528, 2015 WL 4477425, at *2 (D. Nev. July 20, 2015) (ruling "[d]efendants can be liable under the TCPA . . . when they actually send a text"); *Roylance v. ALG Real Estate Servs., Inc.*, No. 14-CV-02445, 2015 WL 1522244, at *5 (N.D. Cal. Mar. 16, 2015) *report and recommendation adopted as modified*, No. 14-CV-02445, 2015 WL 1544229 (N.D. Cal. Apr. 3, 2015) (finding that allegations that a defendant "called [plaintiff] twice" is sufficient to establish direct liability for those calls). Plaintiff's Amended Complaint clearly alleges that "Defendant's AIM system . . . automatically *dialed* Plaintiff's cellular telephone number, and *sent* a text message to his cellular phone." (Amend. Compl. at ¶ 19) (emphasis added). Defendant can, thus, be held directly liable as the entity that actually sent the messages and dialed Plaintiff's cell phone.

In addition, the facts alleged within Plaintiff's Amended Complaint establish that it is Defendant that "takes the steps necessary to physically place [the] telephone call[s]" at issue. Plaintiff's Amended Complaint alleges that "a user of Defendant's AIM system sent a request to Defendant to send an SMS text message to Plaintiff," and that, "Defendant's AIM system processed the request . . . accepted the request, automatically dialed Plaintiff's cellular telephone number, and sent a text message to his cellular phone." (*Id.* at ¶¶ 18–19.) Most importantly, the text message was sent from a "short code operated by Defendant" that was "identified . . . as '265060.'" (*Id.* at ¶ 20.) Thus, it is not that some individual sent a text message through his own wireless cell phone carrier using his own equipment and personal cell phone number. Rather, the allegations within Plaintiff's Amended Complaint establish that it was Defendant's AIM system that took the steps necessary to process the request,

accept the request, convert the message and create a text message that could be sent to Plaintiff's cell phone, and then send it through *its own* equipment and shortcode to Plaintiff.

Citing the same 2013 FCC DISH Network Declaratory Ruling that Defendant appeals to, the 2015 FCC Ruling states that, "initiate suggests some direct connection between a person or entity and the making of a call." (Ex. A at ¶ 29) (citing DISH Network Declaratory Ruling, 28 FCC Rcd. At 6583, ¶ 26)). Plaintiff's Amended Complaint establishes that there was a "direct connection" between Defendant's AIM system and Plaintiff's cellular telephone number such that Defendant can be held directly liable for making the calls.

### F. In Light Of The 2015 FCC Ruling, This Court Should Revisit Its Prior MTD Order Finding The Confirmation Text Not Actionable.

This Court previously held that the "confirmation text" that Plaintiff received after sending a request to Defendant's AIM system to not receive any further messages was "not actionable." (MTD Order at 8–11.) This Court based its prior MTD Order in large part on the premise that "[c]onstruing the TCPA to prohibit consumer-friendly confirmation texts like that at issue here would fly in the face of both common sense and the goals of [the] TCPA." (*Id.* at 11.) Plaintiff respectfully requests that this Court revisit this prior ruling in light of further clarification by the FCC in its 2015 Ruling as to the purpose of the TCPA and what conduct is, and is not, actionable under the TCPA.

In its 2015 Ruling, the FCC refused to limit solely to telemarketing calls the protections that the TCPA provides against automated calls placed to wireless numbers. (Ex. A at ¶ 123.) The FCC noted that "the TCPA broadly prohibits calls made using any 'automatic telephone dialing system' to '*any* telephone number assigned to a cellular telephone service[.]'" (*Id.*) (citing 47 U.S.C. § 227(b)(1)) (emphasis added). The FCC went on to state that "the TCPA contains unique protections for wireless consumers because autodialed and prerecorded calls are increasingly intrusive in the wireless context, especially where the consumer pays for the incoming call." (*Id.* at ¶ 124) (internal citations omitted).

Here, the unauthorized confirmation text message received by Plaintiff was especially intrusive not only because Plaintiff had to pay for his cellular service to receive the incoming message, but also because Plaintiff sent the block request only in response to the previous unauthorized messages and specifically because he did not want to receive any more messages in violation of his privacy. (Amend. Compl. at ¶ 26.) Despite his explicit request, Plaintiff nonetheless received yet *another*, fourth unauthorized message.

While Defendant cites to paragraphs 104–105 of the 2015 FCC Ruling for the proposition that an initial text message "constitutes consent to an informational reply," in the immediately following paragraph the FCC reiterates the same argument that Plaintiff made in his original Opposition to Defendant's Motion to Dismiss and states that "[w]e emphasize that this ruling applies only when the on-demand text message has been *expressly requested* by the consumer in the first instance." (Ex. A at ¶ 106) (emphasis added). By limiting the exception solely to messages that were requested in the first instance, "the potential for consumer harm . . . is substantially mitigated." (*Id.*) Here, Plaintiff certainly did not request any "on-demand" text message "in the first instance." On the contrary, the only thing that Plaintiff "expressly requested" from Defendant was to stop receiving any more messages.

Defendant also points out that this Court previously ruled that Plaintiff "knowingly released his phone number to AOL and thereby consented to be text back at that number." (Def. MTD at 7) (citing MTD Order at 12). However, the 2015 FCC Ruling reiterates that prior express consent can be obtained only when a person provides his wireless number "*in the absence of instructions to the contrary*." (Ex. A at ¶ 52) (emphasis added). Here, Plaintiff *did* give explicit "instructions to the contrary" telling Defendant to stop sending him text messages. To the extent sending a "stop request" text message can even constitute "releasing" one's phone number, Plaintiff's "release" of his number was only incidental to the act of specifically asking to receive no further text messages from Defendant. Thus, Plaintiff never provided any form of express consent to Defendant to receive any text messages on his cell phone.

Because the 2015 FCC Ruling reiterates that the TCPA's prohibition on unauthorized automated calls to cell phones was meant to apply to *any* such call, and because the confirmation text message at issue was not expressly requested by Plaintiff in the first instance and was, in fact, sent only after Plaintiff gave express instructions to receive no further texts, the fourth confirmation text message received by Plaintiff should be actionable.

## IV. <u>CONCLUSION</u>

The 2015 FCC Ruling gives clear guidance that any inquiry into whether a particular system is an ATDS under the TCPA should be based on the system's potential capacity to dial without human intervention. Plaintiff's Amended Complaint alleges facts that show that the same AIM system that sent the initial three text messages to Plaintiff had the potential, if not the present, capacity to send text messages without human intervention. In fact, this Court has already previously ruled that the confirmation text message was "sent automatically." Regardless of whether the confirmation message is actionable, or whether Plaintiff has "standing" to raise violations involving the other automated messages alleged in the Amended Complaint, they are evidence of the AIM system's capacity to dial without human intervention. As for the fourth confirmation message, the 2015 FCC Ruling supports a finding that, regardless of the purpose behind sending a message and regardless of the utility that some may obtain from any given message, the TCPA's restrictions on sending unauthorized automated text messages to wireless devices should be strictly applied. This is especially the case here, where it is undisputed that Plaintiff received three unauthorized messages and then received a fourth message only after specifically requesting that he receive no further messages from Defendant. Accordingly, for the reasons set forth above, Plaintiff respectfully requests that Defendant's Motion to Dismiss be denied in its entirety.

//

//

//

Dated: August 6, 2015

Respectfully submitted,

NICHOLAS DERBY, individually and on behalf of a class of similarly situated individuals

By: /s/ Evan M. Meyers
One of Plaintiff's Attorneys

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

Evan M. Meyers (*pro hac vice*)
emeyers@mcgpc.com
Eugene Y. Turin (*pro hac vice* to be filed)
eturin@mcgpc.com
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Evan M. Meyers, an attorney, certify that on August 6, 2015, I filed the foregoing *Plaintiff's Memorandum of Law In Opposition to Defendant's Motion to Dismiss Amended Complaint* via the Court's CM/ECF electronic filing system. A copy of said document will be electronically transmitted to the following counsel of record:

Eric C. Bosset
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
202-662-5606
ebosset@cov.com

Simon J. Frankel
Covington & Burling LLP
One Front Street
San Francisco, CA 94111
415-591-6000
sfrankel@cov.com

/s/ Evan M. Meyers